# NO. 12-24-00045-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF B.J.D.,*<br>*A CHILD,* | § | *APPEAL FROM THE 173RD* |
| | § | *JUDCIAL DISTRICT COURT* |
| | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

R.D. appeals the termination of his parental rights to the child B.J.D.  In his sole issue, R.D. challenges the sufficiency of the evidence to support the termination.  We affirm.

## BACKGROUND

R.D. is the father and L.M. is the mother of B.J.D. On September 9, 2022, the Department of Family and Protective Services (the Department) filed an original petition for protection of B.J.D., for conservatorship, and for termination of R.D.'s parental rights.[1]  The Department was named temporary managing conservator of the child.

Following a bench trial, the trial court found by clear and convincing evidence that R.D. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (O) and (P) of Texas Family Code, Section 161.001(b)(1).  The trial court also found that termination of the parent-child relationship between the child and R.D. is in the

---

[1] The Department originally sought to terminate both R.D.'s and L.M.'s parental rights.  However, because the Department later concluded that L.M. satisfactorily completed her Family Plan of Service (FPOS), achieved a drug-free lifestyle, maintained safe and stable housing, and demonstrated she could meet the child's needs, it discontinued efforts to terminate her parental rights to B.J.D.

child's best interest.[2]  Based on these findings, the trial court ordered that the parent-child relationship between R.D. and B.J.D. be terminated.  L.M. reunited with the child and regained custody through a monitored return.  The trial court named L.M. as B.J.D.'s sole managing conservator, and this appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights involves fundamental constitutional rights.  *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied).  Because a termination action permanently sunders the bonds between parent and child, the proceedings must be strictly scrutinized.  *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.).  "[W]e must exercise the utmost care in reviewing the termination of parental rights to be certain that the child's interests are best served and that the parent's rights are acknowledged and protected."  *Vela*, 17 S.W.3d at 759.

Section 161.001(b) of the Texas Family Code permits a court to order termination of parental rights if two elements are established.  *See* TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2023).  The movant must show that (1) the parent committed one or more predicate acts or omissions and (2) termination is in the child's best interest.  *See id.* § 161.001(b)(1), (2).  Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other.  *Id.* § 161.001(b); *Wiley*, 543 S.W.2d at 352; *In re J.F.C.*, 96 S.W.3d at 256, 263–64 (Tex. 2002).

The "clear and convincing" evidentiary standard for termination of parental rights is both constitutionally and statutorily mandated.  TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439.  "Clear and convincing evidence" is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (West 2019).  The party seeking termination of parental rights bears the burden of proof.  *In re J.F.C.*, 96 S.W.3d at 263-64.

---

[2] At trial, R.D. did not request that he be named sole managing conservator.  Instead he only argued that his parental rights not be terminated and that he be permitted to maintain visitation rights in some capacity.

## STANDARD OF REVIEW

When presented with a challenge to both the legal and factual sufficiency of the evidence, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.—Amarillo 1999, no pet.). When reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the finding to determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.* The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied).

When reviewing the factual sufficiency of the evidence, we must determine whether the evidence is such that a factfinder reasonably could form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.*, 89 S.W. 3d 17, 25 (Tex. 2002). We give due consideration to evidence that the factfinder reasonably could have found to be clear and convincing, and we consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its ruling. *In re J.F.C.*, 96 S.W.3d at 266. If, considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

## BEST INTEREST OF THE CHILD

In his sole issue, R.D. argues that the evidence is legally and factually insufficient to support the termination of his parental rights to B.J.D. because there was insufficient evidence that the termination was in the best interest of B.J.D.

**Applicable Law**

Trial courts have wide latitude in determining a child's best interest. *Interest of I.N.B.*, 662 S.W.3d 631, 647 (Tex. App.—Beaumont 2023, no pet.). In determining the best interest of

the child, courts consider a non-exhaustive list of factors, including: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the child's best interest; (6) plans for the child by these individuals or the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The Texas Family Code also provides a list of factors that we will consider in conjunction with the *Holley* factors. TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These statutory factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.*

No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). The evidence need not prove all the statutory or *Holley* factors to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The best interest of the child does not require proof of any unique set of factors nor is proof limited to any

4

specific factors. *See **In re D.M.**,* 58 S.W.3d at 814. Evidence supporting the statutory predicate grounds for termination of parental rights also is probative in determining whether termination is in the child's best interest. *See **In re C.H.**,* 89 S.W.3d at 28-29. In conducting a best-interest analysis, "a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence." ***In re J.M.T.**,* 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). We will apply the relevant statutory and *Holley* factors below.

**Discussion**

R.D. acknowledges that he engaged in the predicate acts or omissions set forth in Texas Family Code, Section 161.001(b)(1) and does not challenge that initial finding. Instead, he challenges only the second part of the test: whether termination is in the best interests of the child. *See* TEX. FAMILY. CODE ANN. § 161.001(b)(2). At the outset, we note that evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. ***In re C.H.**,* 89 S.W.3d at 28.

R.D. argues that the evidence at trial regarding the best interest of the child was scant and did not satisfy the clear-and-convincing evidentiary standard, especially since L.M.'s rights were not terminated. According to R.D., the termination of his rights did not provide for more stability or safety than already existed through naming L.M. as the sole managing conservator. He further argues that the trial court should have "crafted a safe and appropriate path forward that did not require termination."

The evidence at trial showed that the Department received an intake on August 15, 2022, which alleged that R.D. committed domestic violence against L.M.[3] Specifically, Monica Cole, a Department investigative supervisor, testified the Department received reports concerning domestic violence, which resulted in R.D.'s allegedly breaking two vertebrae in L.M.'s back. L.M. reported that R.D. pushed her down the stairs while she held B.J.D. as she attempted to leave the home during an argument and that she broke her back during the fall. She stated that R.D. pulled her hair and kicked her repeatedly and she tried to leave because she feared he would harm her or

---

[3] Department Investigative Supervisor Monica Cole testified the family had an extensive Department history including a 2021 case in which B.J.D. was in R.D.'s care. R.D. testified L.M. was required to leave the home for several months as part of a Family-Based Safety Services (FBSS) case and permitted to return after services were offered. R.D. explained the case resulted from L.M.'s not properly feeding B.J.D., which required her to be admitted into a hospital.

B.J.D. At trial, R.D. maintained that he never struck L.M. and that, instead, she slipped and fell during the argument. R.D. testified L.M. told the hospital and the police that she had fallen and that L.M. told investigating officers she did not want R.D. to get into trouble. He indicated he never was criminally charged for anything related to this incident.

### B.J.D.'s physical and mental vulnerabilities

When a child is too young at the time of the final hearing to express her desires, the trial court may infer the child's desires from the evidence presented at the hearing. *See **In Interest of K.M.**, No. 07-16-00120-CV, 2016 WL 3660076, at *4 (Tex. App.—Amarillo June 29, 2016, pet. denied) (mem. op.) (citing **In re S.R.**, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). Furthermore, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." **In re C.H.**, 89 S.W.3d 17, 26 (Tex. 2002).

B.J.D. was four years old at the time of trial and is a special-needs child who requires home-health-care nursing and a feeding tube.[4] R.D. confirmed B.J.D. has medical issues, which require a "G-button" for feeding, and stated he learned how to feed her at a Dallas hospital. He explained she has a bad mitral valve in her heart, which causes her to reject food, she had two surgeries to rectify the issue, and she requires a third surgery. R.D. testified B.J.D. also had seizures and breathing issues while in CPS's care but explained those conditions resolved after she was returned to L.M. Nancy Murillo, a Department caseworker, opined that R.D. did not have a full understanding of B.J.D.'s medical needs because he was against most of the medical recommendations.

### R.D.'s Criminal History, Abusive Conduct, and Substance Abuse

A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. **In re J.D.**, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). With regard to R.D.'s prior, criminal history and allegations of abuse, he testified he had two previous CPS reports from prior relationships—one for an alleged burn mark on a stepdaughter and another, which alleged sexual abuse of that same stepdaughter. He testified that her mother, V.W., "accused me of getting a dildo and cramming it in a nine-year-

---

[4] R.D. testified he has seven children with seven different women.

6

old girl and leaving the room so she could finish up." He further testified that he was charged and convicted for indecency with a child by exposure and spent four-and-one-half years in prison. He also explained that he had a second conviction for inappropriately bathing with his one-year-old son but claimed that this conviction later was reversed on appeal. R.D. confirmed he was convicted as a sex offender and had a pending, felony charge for failure to register in Henderson County, Texas. A parent's current and future incarceration is relevant to his ability to meet the children's present and future physical and emotional needs. *See In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.). R.D. indicated he had other matters in his criminal history like theft by check and "stuff like that."

Murillo testified L.M. discussed in detail the extent of the domestic violence she suffered with R.D. and feared his coming back into her life. Murillo confirmed that L.M. reported concerns about R.D.'s sexual behavior, which in conjunction with R.D.'s status as a sex offender, caused concern for B.J.D.'s being in his care because she was too young to protect herself. L.M. testified that she and B.J.D. stayed with her mother following the August 2022 domestic-violence incident and R.D. kept coming to the home. She alleged that, at one point, he exposed his penis in front of B.J.D. while they sat on the couch.

Abusive or violent conduct can produce an environment that endangers a child's physical or emotional well-being. *See In re J.I.T.P.*, 99 S.W.3d 841, 845-46 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (stating domestic violence supports finding that termination is in child's best interest even when child is not victim of violence). L.M. stated that R.D. was physically abusive to her on one occasion before B.J.D. was born, wherein he kicked her in the stomach during an argument. She further stated that he was verbally abusive toward her, such as calling her a "stupid bitch." After B.J.D. was born, she claimed that he frequently accused her of cheating and the physical abuse increased, namely that he pulled her hair, choked her, and threw her on the ground. L.M. testified that R.D. once pulled a clump of her hair out in front of B.J.D. when the child was two-years-old, and L.M. sustained other injuries like bruises on her back, arms, and legs, black eyes, and scrapes on her face.[5] L.M. further testified that R.D. would not let her work during their

---

[5] After B.J.D.'s removal, the trial court issued an injunction that prohibited R.D. from being within 1,000 feet of L.M. and her family members. R.D. claimed he followed the injunction. R.D. also denied that he ever physically abused L.M. or any other woman.

relationship, except briefly as a housekeeper and she did not have a vehicle or access to money other than when he gave her his debit card to get groceries or drugs.

At the time of B.J.D.'s removal, both parents tested positive for illegal drugs. L.M. tested positive for methamphetamine, opiates, codeine, and morphine, while R.D. tested positive for methamphetamine. A trial court is entitled to consider a parent's history of drug use and irresponsible choices. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). During his drug counseling, R.D. reported that he used methamphetamine for ten years from ages thirty-five to forty-five, and began using the drug again during his relationship with L.M. to "keep it going" in hopes of rekindling their relationship. L.M. testified that R.D. started using methamphetamine around the time she discovered she was pregnant with B.J.D when they were separated briefly and he was depressed. She explained that they both stopped using methamphetamine during her pregnancy but began using again when B.J.D. was about two-months-old and continued until the child's removal in this case. L.M. testified that R.D. used methamphetamine in front of B.J.D., and, at times, left the drug accessible to her.[6]

Robin Rickard, a Department investigator, testified that R.D. tested positive for methamphetamine several times throughout the progression of the case, including during a new investigation a month before trial. R.D. testified he last consumed the drug on Christmas 2023, two months before trial, but he did so unknowingly because an acquaintance slipped the drug into his drink.

*R.D.'s Psychological Testing and Counseling*

R.D. completed a psychological evaluation in October 2022, and was diagnosed with neglect of a child, adjustment disorder with mixed anxiety and depressed mood, unspecified stimulant-related disorder, unspecified personality disorder with narcissistic features, and relationship distress.

Curtis Pickle, a licensed professional counselor, testified he had provided counseling services to R.D. every other week since November 2022, and R.D. had made "very little" progress because he continued to focus on L.M. and had a difficult time seeing he was at fault for anything. He explained that when R.D. recognizes he is to blame for something, they make progress, but the process is slow due to his personality disorder and narcissistic features, which result in his seeing himself only in a good light. Pickle testified that R.D. only attended two sessions without

---

[6] The Department never tested B.J.D. for exposure to drugs.

mentioning L.M.  R.D. also represented that he was attending the Batterers Intervention and Prevention Program (BIPP), parenting classes, and other required programs, but Pickle later discovered that R.D. was not doing so, and noted that R.D. "made excuses" when confronted about his dishonesty.

Concerning goals, Pickle testified that R.D. addressed his defensiveness "a little" but still was easily triggered.  He had a period of clean drug tests but later began testing positive again.  He made some progress with interpersonal relationships, but he generally stayed isolated and continued to completely deny any domestic conflicts.  Pickle stated that he agreed to keep seeing R.D. but typically would have discharged him already due to his lack of progress within six to eight months of trial.  Pickle further opined that it would be difficult for R.D. to co-parent without changing his behavior.  He also indicated that there could be an issue with R.D.'s sex-offense conviction and stated that he knew B.J.D. was examined twice for sexual assault, presumably due to past allegations that R.D. abused B.J.D.

Stephanie Teel stated that she provided substance abuse counseling to R.D. twice monthly since October 2022.  She opined that he would not successfully be discharged by the date of trial. Teel explained, "[p]robably he's made progress, but however, having multiple drug tests, especially, you know, testing positive throughout the case and coming here to the end, and the lack of accountability concerns me, as far as when he does test positive."

### *R.D.'s Visitations With B.J.D. During the Pendency of the Case*

R.D. testified that, as a result of his engagement in parenting classes, he scheduled visitation with B.J.D. every week for two hours, as opposed to his previous visitation schedule of every-other-week.   Murillo testified that R.D. had to be redirected at times during visitations to focus on B.J.D.  She agreed that B.J.D. appeared to enjoy her visits with R.D., loves him, and knows him as her father.  Murillo opined that, regardless of love, sometimes the child's best interest is not served by continuing a relationship in which the parent failed to make the lifestyle changes that would ensure the child's safety while in that parent's care.  Evidence that a child loves a parent and enjoys visits is only marginally relevant to a best-interest finding.  *See **In re D.W.***, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied).  Court Appointed Special Advocate Bobbie Hearron testified the visits between R.D. and B.J.D. generally went "okay."  However, she referenced a visit during the previous summer wherein Department staff had to intervene because R.D. was being argumentative.  Hearron also testified concerning an incident in which R.D. asked

her to watch him wash his hands in the bathroom in preparation for B.J.D.'s visit and, then, unexpectedly proceeded to urinate in her presence.

Cole testified that she had to intervene in a visit at the CPS office two weeks before trial because R.D. became agitated and upset when he was told he had to put his phone away. When Cole came into the room, B.J.D. was "in the furthest corner of the room, standing very still, with her hands to her side, not moving. She appeared to be scared." She removed B.J.D. from the visit and she tried to calm R.D. down for the remainder of the visitation period, as did his attorney, who he called for assistance. They were unsuccessful. Cole described the photos R.D. tried to show B.J.D. on his phone as inappropriate. These photos included mirrored photos of him and his alleged girlfriend, professional wrestler Rhonda Rousey, wearing scant clothing, along with a shadowed photo of his penis.[7] Cole allowed R.D. to say "goodbye" to B.J.D., but she would not speak to or look at him. She indicated that she did not want to tell him goodbye and said she was scared. But ultimately, she gave him a "fist bump." Cole indicated that R.D. acted like he did at the time of B.J.D.'s initial removal when he had admitted to recent methamphetamine use. Based on her past observations, Cole believed R.D. was under the influence of drugs during this visit. R.D. acknowledged that he called Cole a "lying bitch."

### R.D.'s FPOS Plan Noncompliance

The Department created Family Plans of Service (FPOS) for R.D. and L.M., which were made an order of the court. A parent's inability to provide adequate care for the child, lack of parenting skills, poor judgment, and repeated instances of immoral conduct also may be considered when determining the child's best interest. *See **In re C.A.J.**, 122 S.W.3d 888, 893 (Tex. App.— Fort Worth 2003, no pet.). At the time of trial, R.D. had failed successfully to complete his FPOS.

Murillo testified that R.D. failed to complete several tasks and services required as part of his FPOS. Specifically she noted that he failed to complete BIPP classes. She also testified that he failed to complete the parenting class because he failed to provide her with a certificate of completion. Moreover, she stated that R.D. had not been discharged from individual and substance abuse counseling and he continuously tested positive for methamphetamine. Further, he had not demonstrated he could provide a safe, stable home, he had not submitted any NA/AA sign-in sheets to the Department, and he had not produced a driver's license as requested. She did not believe co-parenting, which was recommended by R.D.'s psychological evaluation, was

---

[7] R.D. also claimed to have a personal friendship with the actress, Jennifer Aniston.

appropriate because R.D. continued to deny his own responsibility for the case and L.M. was doing well with B.J.D. Teel's testimony echoed Murillo's and she likewise explained that R.D. was dishonest about satisfying these FPOS requirements and continued to focus on L.M. during counseling sessions.

At trial, R.D. claimed he completed all his services except BIPP classes, and claimed he was "halfway through" this program. He initially was denied BIPP classes because he was not a good candidate due to his "victim-blaming." He testified that he completed the parenting class two weeks before trial but had not yet received a certificate. R.D. indicated he was not currently attending a twelve-step program like AA, which he last attended in May 2023. He indicated that he attempted to attend a meeting at the same location as did L.M. but was told not to attend the meeting while she was present. He confirmed he was still in individual and substance-abuse counseling. R.D. confirmed that he completed the psychological evaluation and he was still in the substance-abuse treatment program recommended by the evaluation. He acknowledged he continued to see drug abuse counselor, Teel, and he claimed that Teel told him her sessions satisfied the NA/AA meeting requirement. But he stopped going to NA/AA meetings a year before trial because of his aforementioned belief that the bodily contact with other meeting members in group hugs caused false-positive drug tests.

As for his employment, R.D. testified that he worked odd jobs on cars upon request and separately for a chrome shop. He further testified that he worked for County Line Express until he was fired. At the time of trial, he explained that he recently was hired by ABC Bus Company, but that the company fired him at employee orientation because he was required to appear for a drug test related to this case.[8]

Turning to the housing requirements in the plan, R.D. testified that he has lived in the same mobile home since he purchased it in 2017. He claimed he was not aware that the finance company sued him for nonpayment on the mobile home. But he admitted that he had not made payments since January 2022, and told the company to repossess it. R.D. confirmed that he still was staying in the mobile home or in a shed converted to habitable living space on his property. He confirmed he lived in a different trailer prior to the current one and, ultimately, was evicted for nonpayment.

---

[8] R.D. explained that he resolved this situation, and he was rehired and scheduled to start work shortly after the trial's conclusion.

*L.M.'s FPOS Plan Compliance*

In contrast, Murillo testified that L.M. had completed all FPOS requirements and had not tested positive for drug use since the removal. She confirmed that L.M. completed individual and substance-abuse counseling and made the changes necessary to parent B.J.D. safely. Murillo related that B.J.D. was returned to L.M. in October 2023, and that B.J.D. was "doing really well." She continued, "Every time I've gone and [L.M.] is present during those visits, she engages well with [B.J.D.]. [B.J.D.] is thriving. She's actually gone down on her oxygen machine that she used to use." Murillo confirmed that B.J.D.'s medical condition had improved to the point that surgery could be completed sooner, CPS had no concerns with the care B.J.D. was receiving from L.M., and there was a nurse in the home Monday through Friday during work hours. She testified that L.M. had been employed since August she had visited L.M.'s home weekly during the monitored return, including unannounced visits, and she had no concerns. Based on this evidence, the trial court reasonably could have determined that B.J.D. desires to stay with L.M., with whom she is happy, is well cared for, is thriving, and has her needs met. *See S.R.*, 452 S.W.3d at 369; *K.M.*, 2016 WL 3660076, at *4.

**Conclusion**

In summary, B.J.D. is a special-needs child who requires a high degree of health care and emotional support. The evidence at trial showed that R.D. is a convicted sex offender, who committed such sexual offenses against other children in his household, he has a pending felony charge for failing to register as a sex offender, and there existed numerous other troubling incidents involving R.D.'s inappropriate, sexual conduct. The record further reflects that R.D. also allegedly committed numerous acts of domestic violence against L.M., some of which occurred in B.J.D.'s presence. Furthermore, R.D. has demonstrated an inability to discontinue abusing dangerous drugs throughout the case, including during the period shortly prior to trial. R.D. also has failed to complete his FPOS requirements and has not demonstrated that he can create a safe and stable home environment for B.J.D.

After viewing the evidence in the light most favorable to the trial court's best-interest finding and applying the statutory and *Holley* factors, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of R.D.'s parental rights was in the best interest of B.J.D. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Any contrary evidence is not so significant that a reasonable factfinder could not have reconciled

it in favor of its finding and formed a firm belief or conviction that terminating R.D.'s parental rights is in the B.J.D.'s best interest. Therefore, because the evidence is legally and factually sufficient to support the trial court's best-interest finding, we overrule R.D.'s sole issue.

## DISPOSITION

Having overruled R.D.'s sole issue, we *affirm* the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered August 21, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 21, 2024**

**NO. 12-24-00045-CV**

**IN THE INTEREST OF B.J.D., A CHILD**

Appeal from the 173rd District Court
of Henderson County, Texas (Tr.Ct.No. FAM22-0554-173)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*